**CASE NO. 1:25-CV-09889 (JSR)**

**ORAL ARGUMENT REQUESTED**

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

The Asbestos Parties,

*Appellant*,

v.

Raymond Chabot, Inc., in its capacity as foreign representative for Asbestos Corporation Limited, et al.,

*Appellee*.

On Appeal from the United States Bankruptcy
Court for the Southern District of New York

*In re Asbestos Corporation Limited, Debtor in a Foreign Proceeding*
Bankruptcy Case No.  25-10934 (MG)

**OPENING BRIEF OF APPELLANT**

Cullen D. Speckhart
Michael Klein
Jeremiah P. Ledwidge
**COOLEY LLP**
55 Hudson Yards
New York, New York 10001
Tel: (212) 479-6000
Email: cspeckhart@cooley.com
        mklein@cooley.com
        jledwidge@cooley.com

Charles W. Branham, III
(admitted *pro hac vice*)
**DEAN OMAR BRANHAM
SHIRLEY, LLP**
1801 N. Lamar Street, Suite 300
Dallas, Texas 75201
Tel: (214) 722-5990
Email: branham@dobslegal.com

*Counsel for Appellant The Asbestos
Parties*

Matthew T. Richardson
(admitted *pro hac vice*)
Kathleen M. Stoughton
(admitted *pro hac vice*)
**WYCHE, P.A.**
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Tel: (803) 254-6542
Email: mrichardson@wyche.com
        kstoughton@wyche.com

# Table of Contents

Table of Authorities.................................................................................................iv

Introduction.............................................................................................................1

Jurisdictional Statement..........................................................................................3

Statement of the Issues............................................................................................5

Standard of Review..................................................................................................6

Statement of the Case..............................................................................................7

1.    ACL and Certain London Market Insurers enter into the Interim Settlement Agreement...............................................................................................7

2.    U.S. courts manage tens of thousands of claims against ACL while ACL resists discovery, contests court authority, and frustrates defense arrangements.................................................................................................8

3.    ACL and CLMI seek to leverage the CCAA and ACL's nominal, legacy ties with Canada to force thousands of U.S. tort claims into a foreign venue that is friendlier to its goals and enables it to avoid victim protections codified in U.S. law....................................................................................................10

4.    The bankruptcy court held a hearing and received testimony about ACL's ties to the United States and its limited Canadian operations ..........................13

5.    The bankruptcy court recognized the CCAA proceeding as a foreign main proceeding, alternatively found it would qualify as a foreign nonmain proceeding, and extended the automatic stay to non-debtor third parties..........16

Summary of the Argument.....................................................................................20

Argument................................................................................................................23

I.    The Bankruptcy Court Erred by Recognizing the CCAA Proceeding as a Foreign Main Proceeding and by Alternatively Finding that the CCAA Proceeding Would Qualify as a Foreign Nonmain Proceeding..........................23

       A. The CCAA Proceeding is not a foreign main proceeding because ACL's COMI is not in Canada ...............................................................................24

   i. ACL's primary assets are in the United States ...................................25

   ii. The creditors' preference and expectations weigh heavily against a Canadian COMI ...............................................................................29

   iii. ACL's Canadian-based activities and assets are modest in scope and significance when compared to its U.S.-based affairs ......................32

   iv. The bankruptcy court wrongly excluded evidence that would have confirmed that ACL's COMI is not in Canada ...................................34

  B. The CCAA Proceeding is not a foreign nonmain proceeding .......................39

II. Even if Recognition of the CCAA Proceeding Were Proper, the Bankruptcy Court Erred by Extending the Automatic Stay to Non-Debtor Third Parties .....41

  A. Extending the stay fails to "sufficiently protect" the creditors' interests, as required by section 1522 ......................................................................42

  B. Extending the stay fails to effectuate the purpose of chapter 15 .................46

III. The Bankruptcy Court Erred by Ordering Relief that is Manifestly Contrary to U.S. Public Policy, and its Decision Gives Future Debtors a Roadmap to Avoid the Strictures of U.S. Bankruptcy Law ..................................................48

  A. Recognition of the CCAA Proceeding and extension of the automatic stay are manifestly contrary to U.S. public policy .............................................48

  B. If allowed to stand, the bankruptcy court's decision gives future debtors a roadmap to avoid the strictures of U.S. bankruptcy law and make an end run around the Supreme Court's decision in Purdue ...................................55

Conclusion .................................................................................................................59

Federal Rule of Bankruptcy Procedure 8015(h) Certificate of Compliance ...................60

# **Table of Authorities**

**Cases**

*Am. Indus. Cont., Inc. v. Johns–Manville Corp.*, 326 F.Supp. 879 (W.D. Pa. 1971) ...................................................................................................................10

*Arsenith v. 3M Co.*, No. 24CV089313 (Cal. Sup. Ct. 2024)...................................10

*Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234 (2d Cir. 2004) ......43

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628 (D.S.C. 1992) ............10

*EMA GARP Fund v. Banro Corp.*, 2019 WL 773988 (S.D.N.Y. Feb. 21, 2019).....11

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) .......................... 22, 48, 55

*In re Crédito Real S.A.B. DE C.V. SOFOM, E.N.R.*, 2026 WL 881444 (D. Del. Mar. 31, 2026) ...............................................................................................................56

*In re Arctic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534 (D. Del. 2017) .......................11

*In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009)...................... 42, 44

*In re Avaya Inc.*, 602 B.R. 445 (S.D.N.Y. 2019)...................................................6, 36

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007)....................................................................23

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 384 B.R. 325 (S.D.N.Y. 2008) …………………………………………………….28, 39

*In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570 (S.D.N.Y. 2019).............6, 34

*In re Blixseth*, 484 B.R. 360 (B.A.P. 9th Cir. 2012)................................................26

*In re Brit. Am. Ins. Co.*, 425 B.R. 884 (Bankr. S.D. Fla. 2010)............ 28, 33, 40, 41

*In re CGG S.A.*, 579 B.R. 716, 719-20 (Bankr. S.D.N.Y. 2017)............................55

*In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012)..............51

*In re Creative Fin. Ltd.*, 543 B.R. 498 (Bankr. S.D.N.Y. 2016) ....................... 40, 41

*In re Crédito Real S.A.B. DE C.V. SOFOM, E.N.R.*, 2026 WL 881444 (D. Del. Mar. 31, 2026) ................................................................................................................56

*In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006) ............. 18, 51, 52

*In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013)........... 24, 25, 28, 30, 31, 33

*In re Maschinenbau*, 664 B.R. 863 (Bankr. N.D. Ga. 2024) ...................... 46, 47, 48

*In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463 (Bankr. S.D.N.Y. Feb. 24, 2025) .................................................................................................29

*In re Mod. Land (China) Co., Ltd.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022).............29

*In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015) ................................................31

*In re Ocean Rig UDW Inc.*, 585 B.R. 31 (S.D.N.Y. 2018) ........................................6

*In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457 (Bankr. S.D.N.Y. 2025)................................................................................56

*In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169 (Bankr. S.D.N.Y. 2017) ................................................................................................................ 23, 31

*In re Qimonda AG Bankr. Lit.*, 433 B.R. 547 (E.D. Va. 2010) ...............................44

*In re Olinda Star Ltd.*, 614 B.R. 28 (Bankr. S.D.N.Y. 2020)..................................25

*In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012)................................................50

*In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237 (Bankr. S.D.N.Y. 2019) ................................................................................................................25

*In re Serviços de Petróleo Constellation S.A.*, 613 B.R. 497 (Bankr. S.D.N.Y. 2020) ................................................................................................................27

*In re SPhinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006) ........................ 23, 24, 25

*In re Sunac China Holdings Ltd.*, 656 B.R. 715 (Bankr. S.D.N.Y. 2024) ........ 26, 27

*In re Toft*, 453 B.R. 186 (Bankr. S.D.N.Y. 2011) ................................................ 49, 50

*Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14 (4th Cir. 2013) ........................... 44, 45, 49

*Kingstown Cap. Mgmt., L.P. v. Vitek*, 2020 WL 5350492 (S.D.N.Y. Sept. 4, 2020) ....................................................................................................................43

*Kotzerke v. 3M Co.* (Case No. 23-2-05287-6) ...........................................................36

*Lavie v. Ran*, 406 B.R. 277 (S.D. Tex. 2009) ...........................................................39

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ............................................56

*Rao v. Rodriguez*, No. 14-CV-1936 (NGG) (ST), 2017 WL 1753489 (E.D.N.Y. May 1, 2017) .............................................................................................................35

*Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, No. 5:20-CV-02274-JMG, 2022 WL 2188146 (E.D. Pa. Mar. 7, 2022) ............................................................36

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522 (1987) ................................................................................................9

*Tibbs v. 3M Co.*, No. 2023-CP-40-01759 (S.C. Ct. Comm. Pleas 2023) ..............8

*United States v. Garnes*, 102 F.4th 628 (2d Cir. 2024) ...........................................39

*Welch v. Advance Auto Parts, Inc.*, 916 S.E.2d 320 (S.C. 2025) ..............................9

**Statutes**

11 U.S.C. § 1501 ......................................................................................................23

11 U.S.C. § 1502 .............................................................................................. 24, 39

11 U.S.C. § 1506 ............................................................................ 21, 49

11 U.S.C. § 1516 ....................................................................................24

11 U.S.C. § 1517 ....................................................................................23

11 U.S.C. § 1521 ............................................................. 21, 41, 42, 55

11 U.S.C. § 1522 ............................................................. 21, 41, 42, 45

11 U.S.C. § 524 ............................................................... 13, 50, 53

28 U.S.C. § 158 .......................................................................................3

28 U.S.C. § 157 ...............................................................................3, 6, 11

**Rules**

Fed. R. Civ. P. 30 ..................................................................................37

Fed. R. Civ. P. 32 ..................................................................................35

Fed. R. Evid. 801 ..................................................................................36

Fed. R. Bankr. P. 8002 .............................................................................4

Fed. R. Bankr. P. 8015 ...........................................................................60

Wash. Super. Ct. Civ. R. 30(b)(6) ……………………………………. 37

**Other Authorities**

D. M. Primoff et al., Psst, Need a Non-Consensual Third Party Release After the Supreme Court's Purdue Decision?: Consider a Non-U.S. Proceeding Plus Chapter 15 Recognition (July 2, 2024)..........................................................................58

D. Spelfogel et al., Third-Party Releases Alive and Well in Chapter 15—Creative Maneuver or Comity?, 41 Rev. Banking & Fin. Servs. 81 (July 2025) ..................58

H.R. Rep. No. 109–31, pt. 1, 109th Cong. 1st Sess. at 112–13 (2005) ....................24

J. Mazza et al., Nonconsensual Third-Party Releases Are Alive and Well in Chapter 15 Despite *Purdue*, Skadden, Arps, Slate, Meagher & Flom LLP (July 9, 2025)...57

Kovsky-Apap, 3 Notable Developments in Ch. 15 Bankruptcy This Year, Troutman Pepper Locke (Dec. 15, 2025) ...............................................................................58

United Nations Commission on International Trade Law, UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation .............49

**<u>Introduction</u>**

Asbestos Corporation Limited ("ACL") engaged in asbestos mining for decades, operating open-pit chrysotile asbestos mines and shipping asbestos worldwide, including to the United States.  Nearly fifty years ago, ACL ceased its mining operations.  Since then, ACL's corporate operations have been focused entirely in the United States, and they consist of defending tens of thousands of U.S. tort suits for injuries relating to ACL's historical sale of asbestos.  In that time, ACL has disobeyed court orders, was held in contempt, and had its answers stricken for its refusal to comply with the most basic discovery.  These tactics were used as part of a nationwide plan to obstruct U.S. victims of asbestos exposure from prosecuting their cases against ACL.

This case represents the next step in ACL's plan to shield itself from liability: ACL now seeks to leverage its nominal, legacy ties with Canada to force thousands of involuntary, U.S.-based asbestos victims into a foreign venue friendlier to its goals.  The question in this case is whether those U.S.-based claimants—many of whom the bankruptcy court acknowledged are "suffering from awful, painful, and oftentimes fatal diseases" (Mem. Op. at 24 (Appendix, Tab 15))—must be forced to litigate their claims, at great expense, in Canada, or whether their claims can proceed (as they have for many years) in the United States.  In allowing ACL to funnel these

claims to a Canadian proceeding, the bankruptcy court committed multiple legal errors, and this Court should reverse.

To begin, in recognizing ACL's Canadian proceeding under chapter 15 and extending the automatic stay to third parties, the bankruptcy court ignored the evidence that ACL's current activities occur overwhelmingly in the United States and not Canada. Worse still, although the court was required to consider the U.S.-based creditors' expectations, it declined to do so because of their status as "involuntary" creditors—in other words, because of their status as innocent victims of a debtor's misconduct, their desires and expectations were irrelevant. The bankruptcy court invented that distinction between voluntary and involuntary creditors, and it has no basis in the law.

Beyond failing to properly assess ACL's activities, the bankruptcy court rendered chapter 15's public policy exception a nullity by granting relief even though this first ever Canadian asbestos CCAA proceeding lacks the structural protections that Congress has deemed critical in asbestos litigation. In enacting section 524(g), Congress determined that asbestos mass tort liabilities should be centralized or channeled away from U.S. tort claimants only when specific procedural safeguards—such as an independent future claimants' representative, a supermajority vote, and trust supervision—are provided. But the bankruptcy court granted relief without ever asking if the foreign proceeding contains similar

2

protections, forcing grievously ill asbestos victims to abandon their U.S. tort suits and pursue claims in a foreign forum that lacks the necessary protections. In doing so, the bankruptcy court demonstrated how asbestos debtors can use chapter 15 to avoid chapter 11's prohibition on third-party releases absent compliance with section 524(g). Without clarification from this Court, decisions like the one below will create a roadmap for debtors to use chapter 15 restructuring to escape asbestos-specific safeguards that Congress deliberately imposed.

## Jurisdictional Statement

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(P). This Court has jurisdiction over the appeal of the bankruptcy court's final orders under 28 U.S.C. § 158(a). The bankruptcy court entered its orders—*Memorandum Opinion Granting Motion for Recognition of Foreign Main Proceeding and Additional Relief and Overruling Asbestos Parties Objections* ("Mem. Op."), (Docket No. 141 (Appendix, Tab 15)), and *Order (I) Recognizing the CCAA Proceeding of Asbestos Corporation Limited as a Foreign Main Proceeding and (II) Granting Related Relief*, (Docket No. 142 (Appendix, Tab 16)) (collectively, the "Recognition Orders")—on October 30, 2025.

On November 12, 2025, the Asbestos Parties[1] filed a timely Notice of Appeal. (Docket No. 144 (Appendix, Tab 17)); *see* Fed. R. Bankr. P. 8002(a)(1) (requiring notice of appeal to be filed within 14 days of entry of the order being appealed).  On November 13, 2025, the Asbestos Parties filed an Amended Notice of Appeal. (Docket No. 145 (Appendix, Tab 18)).  The notice of appeal became effective on January 16, 2026, when the bankruptcy court denied the Asbestos Parties' Motion to Alter or Amend the Judgment.  (Docket No. 157 (Appendix, Tab 21)); *see* Fed. R. Bankr. P. 8002(b)(1)(B), (b)(2) (notice of appeal filed before the court disposes of a motion to alter or amend the judgment becomes effective when the court disposes of the motion).

---

[1] The "Asbestos Parties" are Charles M. Forman, solely in his capacity as the Chapter 7 Trustee for the bankruptcy estate of National Services Industries, Inc. ("NSI") in connection with NSI's Chapter 7 bankruptcy case pending in the United States Court for the District of Delaware under case no. 12-12057 (MFW), along with certain individuals with personal injury claims pending against the above-captioned debtor, Asbestos Corporation Limited.

## **Statement of the Issues**

I.    Whether the bankruptcy court erred in recognizing the CCAA Proceeding as a foreign main proceeding or in alternatively finding it would qualify as a foreign nonmain proceeding.

II.    Whether the bankruptcy court erred in extending an automatic stay to non-debtor third parties.

## Standard of Review

This Court reviews a bankruptcy court's legal conclusions de novo and its factual findings for clear error. *In re Ocean Rig UDW Inc.*, 585 B.R. 31, 34–35 (S.D.N.Y. 2018), *aff'd*, 764 F. App'x 46 (2d Cir. 2019). It reviews a bankruptcy court's evidentiary rulings for abuse of discretion, and a court "abuses its discretion if it rests its conclusion on clearly erroneous factual findings or an incorrect legal standard." *In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570, 582 (S.D.N.Y. 2019) (quoting *In re Avaya Inc.*, 602 B.R. 445, 453 (S.D.N.Y. 2019)).

**Statement of the Case**

For decades, ACL operated asbestos mines and shipped asbestos worldwide, including to the United States. (Oct. 8 Tr. at 153:9–15 (Appendix, Tab 14A)). Since mining operations ceased in the 1980s, ACL's primary business has consisted of defending tort suits in the United States for injuries relating to its historical sale of asbestos. (Docket No. 4 at 13 ¶ 16 (Appendix, Tab 2)); *see also* (Mem. Op. at 6 (Appendix, Tab 15)). ACL's only other business operations are nominal: maintaining and leasing legacy industrial property and pursuing limited efforts to monetize asbestos-contaminated tailings (mining waste material) at its Quebec chrysotile asbestos mine sites. (Oct. 8 Tr. at 181:17–182:6; 217:7–13; 184:21–187:25; 238:10–240:19 (Appendix, Tab 14A)).

1. **ACL and Certain London Market Insurers enter into the Interim Settlement Agreement.**

In 1998, ACL and CLMI[2] entered an Interim Settlement Agreement ("ISA") that governs the defense and resolution of asbestos-related bodily injury claims and

---

[2] Certain Underwriters at Lloyd's, London, The Scottish Lion Insurance Company Limited, Tenecom Limited (as successor to Winterthur Swiss Insurance Company, formerly known as Accident & Casualty Insurance Company of Winterthur, Switzerland, and to Yasuda Fire and Marine Insurance Company (UK) Limited and now known as Tenecom Limited), The Ocean Marine Insurance Company Limited (as successor to liabilities of Commercial Union Assurance Company Limited, The Edinburgh Assurance Company, The Indemnity Marine Assurance Company Limited, The Northern Assurance Company Limited, The Road Transport & General Insurance Company Limited, United Scottish Insurance Company Limited, and The

the payment of defense costs, settlements, and judgments under CLMI excess policies originally purchased for General Dynamics Corporation, a U.S.-based company and ACL's former indirect parent. (CLX2 (Appendix, Tab 31)); (Docket No. 23 at 38 (Appendix, Tab 3)).[3] The ISA requires CLMI consent for settlements above a threshold and contemplates reimbursement mechanics subject to policy terms. (*Id.*).

### 2. U.S. courts manage tens of thousands of claims against ACL while ACL resists discovery, contests court authority, and frustrates defense arrangements.

Throughout the history of ACL's U.S. litigation, U.S. courts have repeatedly confronted and condemned ACL's litigation tactics. For years, ACL resisted basic discovery and court orders in U.S. asbestos cases, leading courts to impose sanctions and, in South Carolina, to appoint a receiver. (Docket No. 23 at 5, 19–23 (Appendix, Tab 3)). In the South Carolina case,[4] ACL refused to participate in jurisdictional

---

Victoria Insurance Company Limited), and NRG Victory Reinsurance Limited, as successor to liabilities of New London Reinsurance Company Limited (collectively, "CLMI").

[3] ACL is a named "also insured" under these policies. (CLX2 (Appendix, Tab 31)); (Docket No. 23 at 38 (Appendix, Tab 3)). Because of the substantial amount of insurance, the policies cannot realistically be exhausted. *See* (APX86 (Appendix, Tab 29)) (email with exhibit providing information regarding ACL's insurance limits filed under seal).

[4] *Tibbs v. 3M Co.*, No. 2023-CP-40-01759 (S.C. Ct. Comm. Pleas 2023); (APX14 (Appendix, Tab 24)).

discovery, prompting the court to deny ACL's motion to dismiss for lack of personal jurisdiction, order a corporate witness be designated for a Rule 30(b)(6) deposition, and warn of contempt.  (*Id.* at 7–10).  When ACL still refused, the court held ACL in contempt and struck its pleadings.  (*Id.* at 10–11).  The court found ACL engaged in "moral fraud"—"a conscious intent to defeat, delay or hinder creditors"—then appointed a receiver and empowered him to administer ACL's insurance assets and "investigate the existence of all insurance or indemnifications coverages or claims relating thereto which are potentially available to ACL."[5]  (*Id.*); (APX14 (Appendix, Tab 24)).

That pattern was not isolated to South Carolina.  Across multiple jurisdictions, ACL invoked the Quebec Business Concerns Records Act as a shield against discovery, a position repeatedly rejected by U.S. courts.  *See, e.g.*, *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987) ("It is well settled that [blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even

---

[5] The South Carolina Supreme Court, in a companion case dealing with ACL's sister corporation, Atlas Turner, Ltd.—a company owned by ACL's parent, Mazarin, Inc.—affirmed the appointment of the receiver. *Welch v. Advance Auto Parts, Inc.*, 916 S.E.2d 320 (S.C. 2025).  The Receiver takes no position on the merits of this proceeding.  (Docket No. 23 at 5 (Appendix, Tab 3)).

though the act of production may violate that statute."); *Am. Indus. Cont., Inc. v. Johns-Manville Corp.*, 326 F.Supp. 879, 880–81 (W.D. Pa. 1971); *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628, 644–46, 644 n.24 (D.S.C. 1992).  Courts in Missouri, Louisiana, and Washington likewise documented sanctions against ACL—including striking pleadings, defaults, and contempt—when it refused to participate in discovery.  (Docket No. 23 at 18–22 (Appendix, Tab 3)).

At the same time, ACL minimized or denied the existence of insurance.  ACL's counsel in South Carolina claimed there was "no coverage" to tender; yet the Receiver later discovered substantial insurance coverage and reimbursements.  (*Id.* at 13, 24–26).  ACL has even thwarted efforts by other parties that might result in its liability: In California,[6] CLMI retained defense counsel, but ACL's national counsel abruptly disclaimed that representation.  (*Id.* at 21–22).  ACL defaulted, and plaintiffs moved for a nine-figure default judgment.  (*Id.*).

These circumstances illustrate a consistent pattern: resist discovery, contest court authority, and frustrate defense arrangements, all while U.S. courts attempt to manage claims arising from ACL's historic asbestos sales into American markets.  (*Id.* at 13–16, 21–26).

### 3. ACL and CLMI seek to leverage the CCAA and ACL's nominal, legacy ties with Canada to force thousands of U.S. tort claims into a foreign

---

[6] *Arsenith v. 3M Co.*, No. 24-CV-089313 (Cal. Sup. Ct. 2024).

> **venue that is friendlier to its goals and enables it to avoid victim protections codified in U.S. law.**

On May 5, 2025, CLMI initiated insolvency proceedings on behalf of ACL in the Quebec Superior Court under the Companies' Creditors Arrangement Act (the "CCAA"). (APX76 (Appendix, Tab 27)). ACL was added as a co-applicant later that day. (Oct. 8 Tr. at 126:11–16 (Appendix, Tab 14A)). The CCAA provides certain insolvent companies the opportunity to restructure by approving a plan of arrangement with court supervision. *See generally In re Arctic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534 (D. Del. 2017). As part of CCAA proceedings, the court appoints a licensed solvency trustee to act as a monitor, and the CCAA court has the power to grant a stay of proceedings in favor of the debtor. *See EMA GARP Fund v. Banro Corp.*, 2019 WL 773988, at *1 (S.D.N.Y. Feb. 21, 2019). More than 1,500 U.S. asbestos creditors affirmatively objected to having their claims heard in the CCAA Proceeding. (Docket No. 74, Exhibit 1 at 10 ¶¶ 26–27 (Appendix, Tab 7)); (Docket No. 76, Exhibit 7 (Appendix, Tab 9)). Despite this, the Canadian court promptly entered interim stay relief extending beyond ACL to other stakeholders, including CLMI, CLMI's third-party claims administrator, U.S.-based Resolute Management, Inc., and U.S.-based General Dynamics. (Docket No. 2, Exhibit 3 at 8–9 ¶ 26 (Appendix, Tab 1)). The Canadian court then extended the stay of

11

proceedings to ACL and the non-debtor third parties until a vote is held on the future plan of arrangement. (Docket No. 66, Exhibit 1 at 30–31 (Appendix, Tab 5)).

The day after the CCAA Proceeding was initiated, the Foreign Representative[7] commenced a chapter 15 proceeding in the U.S. Bankruptcy Court for the Southern District of New York, seeking recognition of the CCAA Proceeding and extension of stay-like protections to ACL and to non-debtors CLMI, Resolute, and General Dynamics. (Docket No. 4 at 21 ¶ 37 (Appendix, Tab 2)). Immediately following the commencement of chapter 15 proceedings, the bankruptcy court entered a preliminary injunction pending a final decision on the Foreign Representative's Petition for recognition. (Docket No. 37 (Appendix, Tab 4)).

The Asbestos Parties filed a comprehensive Objection opposing recognition and opposing any extension of a stay to non-debtors. (Docket No. 75 (Appendix, Tab 8)). They argued that ACL's operational, financial, and litigation footprint is overwhelmingly U.S.-based, and as such, the bankruptcy court should deny recognition to the CCAA proceeding. (*Id.*). They further argued that, even if the foreign proceeding were recognized, extending the stay to the insurers and the former parent company violated chapter 15's requirement that creditors receive

---

[7] The Foreign Representative in this case is Raymond Chabot, Inc. (Docket No. 2 at 1 (Appendix, Tab 1)). Raymond Chabot, Inc. is also the court-appointed monitor in the CCAA Proceeding. (*Id.*).

"sufficient protection" and contravened U.S. public policy by immediately displacing U.S. asbestos victims from U.S. courts and by channeling their rights into a foreign process that lacks protections Congress outlined in 11 U.S.C. § 524(g). (*Id.*).

### 4. The bankruptcy court held a hearing and received testimony about ACL's ties to the United States and its limited Canadian operations.

The bankruptcy court conducted a two-day evidentiary hearing on October 8–9, 2025, admitting declarations and live testimony as well as exhibits addressing ACL's insurance, the ISA, and CLMI's financing arrangement in Canada.

Among other points, the hearing record reflects that:

- CLMI played a central role in the CCAA strategy from the outset, as demonstrated by CLMI—not ACL—being the one to initiate the CCAA Proceedings, (Oct. 8 Tr. at 126:2–19 (Appendix, Tab 14A));

- the insurers wielded approval and funding-cutoff rights over key steps in the CCAA Proceeding, including the plan of arrangement, payment of lawyers, approval of orders, mandatory translations, and expenses of the monitor, (Oct. 9 Tr. at 71:3–73:8, 75:20–23, 80:24–82:11 (Appendix, Tab 14B)); and

13

- the CCAA lacks key protections codified in section 524(g), such as an independent future-claims representative, a creditors committee, a supermajority vote, channeling injunction safeguards, and ongoing judicial oversight, (Oct. 8 Tr. at 281:8–286:24 (Appendix, Tab 14A)).

The record shows that ACL's creditors consist almost entirely of U.S. asbestos victims, with more than 6,000 pending cases in the United States and no asbestos personal-injury claims in Canada. (Oct. 8 Tr. at 28:15–20; 267:16–19 (Appendix, Tab 14A)). These liabilities arise entirely under U.S. tort law, the vast majority of which are pending in state courts. *See* (*id.*). ACL has been sued in more than 57,000 U.S. asbestos cases, has settled nearly 20,000, has had over 31,000 dismissed, and has roughly 6,100 remaining, all within U.S. jurisdictions. (APX83 (Appendix, Tab 28)); (Oct. 8 Tr. at 59:3–15; 267:16–19 (Appendix, Tab 14A)). The claims concern U.S. exposures, U.S. injuries, and U.S. state-law causes of action. (Docket No. 2, Exhibit 2 at 11–12 (Appendix, Tab 1)).

The company's highest-value assets are its U.S.-based insurance policies that exist solely to resolve these U.S. cases. (APX86 (Appendix, Tab 29)); (Docket No. 4 at 37 ¶ 69 (Appendix, Tab 2)). These insurance assets, which are governed by New York law, have paid more than $90 million in defense and indemnity costs in the

14

United States.  (Docket No. 68 at 4 (Appendix, Tab 6)); (CLX2 at 20 ¶ 16 (Appendix, Tab 31)).  The ISA, which governs the administration of these policies for the U.S. tort cases, contains both a New York choice-of-law provision and a New York arbitration venue provision.  (Docket No. 4 at 24 ¶ 45 (Appendix, Tab 2)); (Docket No. 2 at 8 ¶ 27 n.8 (Appendix, Tab 1)).  And the policies are managed in the U.S. by Resolute, a Boston-based entity.  (APX76 at 32 (Appendix, Tab 27)).

As to ACL's Canadian operations, Guy Bérard, ACL's president, testified that ACL's activities at the time of filing the chapter 15 proceeding consist of (1) maintaining its 11,000-acre legacy mining site, (2) overseeing asbestos contaminated residual tailings left from mining operations that stopped several decades ago, and (3) permitting pilot-scale testing at a demonstration plant that ACL and its subsidiary 3R Minerals operate to support pre-commercial development work by partners rather than to process tailings at commercial scale.  (Oct. 8 Tr. at 181:17–182:6; 217:7–13; 184:21–187:25; 238:10–240:19 (Appendix, Tab 14A)).  He further confirmed that ACL's revenues stem primarily from passive rental of buildings and land, and from a third-party granite quarry operating on ACL property that pays royalties per ton extracted, rather than from ACL's own commercial operations. (Oct. 8 Tr. at 183:1–5; 188:17–23 (Appendix, Tab 14A)).  He testified that ACL's "gray-to-green" efforts are carried out almost entirely by an outside restoration company that simply uses ACL's land for their own environmental work, providing

15

ACL only access-based payments. (Oct. 8 Tr. at 189:1–13; 219:20–220:6 (Appendix, Tab 14A)). And while 3R Minerals was described as assisting with testing and site-related activities, Bérard made clear that 3R Minerals is a wholly owned subsidiary created for marketing purposes, and it does not have board meetings or own any assets. (Oct. 8 Tr. at 191:1–16; 192:1–11 (Appendix, Tab 14A)).

The court excluded from evidence the prior deposition of André LaChance, a former ACL employee and ACL's designated corporate representative tasked with speaking for the company, who confirmed that ACL does not have any non-asbestos business lines or employees. (Docket No. 127 at 2–5 (Appendix, Tab 13)); (APX3 at 24:21–22 (Appendix, Tab 23) (Q: "Does [ACL] sell anything?" A: "No.")); (*Id.* at 29:7–8 (Appendix, Tab 23) ("There's nobody else at ACL today apart from me.")). And during the hearing, the court also excluded two exhibits in which Richard Dufour—counsel to ACL and a former 30(b)(6) witness, who spoke on behalf of the company as recently as October 2024—declared that ACL "has only seven employees at this time," who "all are involved in clerical and administrative activities generally involved with asbestos lawsuits." (APX65 at 2 ¶ 4 (Appendix, Tab 26)); *see* (APX44 (Appendix, Tab 25)).

**5. The bankruptcy court recognized the CCAA proceeding as a foreign main proceeding, alternatively found it would qualify as a foreign**

**nonmain proceeding, and extended the automatic stay to non-debtor third parties.**

On October 30, 2025, the bankruptcy court issued a Memorandum Opinion and Order recognizing the CCAA Proceeding as a foreign main proceeding and extending the automatic stay to non-debtors CLMI, Resolute, and General Dynamics. (Docket No. 141 (Appendix, Tab 15)); (Docket No. 142 (Appendix, Tab 16)).

The court began by analyzing where ACL's center of main interests (known as its COMI) lies, and it acknowledged that "some factors, including the location of the creditors and the law that would govern most disputes, suggest a possible COMI in the United States." (Mem. Op. at 18 (Appendix, Tab 15)). Still, it relied on the nominal location of ACL's headquarters in Quebec and the company's legacy activities in Canada to determine that ACL's COMI is in Canada. (*Id.* at 19–21). As to ACL's insurance assets, which it described as ACL's "primary assets," the court relied on the existence of the CCAA Proceeding to conclude that they were located in Canada, or "[a]t best," "in both Canada and the U.S." (*Id.* at 21–22). Finally, the court explained that although it "might be true" that the U.S.-based claimants "never had a legitimate expectation that the [foreign] courts would play any role" in resolving their claims, it dismissed that concern as irrelevant because the claimants did not voluntarily choose to extend credit to ACL. (*Id.* at 23–25

17

(internal quotation marks and citation omitted)).  Based on the same facts, the court found that ACL has an "establishment" in Canada sufficient for recognition of a foreign nonmain proceeding.  (*Id.* at 25–26).

The court then extended the automatic stay to CLMI, Resolute, and General Dynamics because of the future possibility that ACL's Berkshire Hathaway managed insurers might become insolvent.  Although it acknowledged that "no provision similar to section 524(g) exists under Canadian law," the court dismissed the Asbestos Parties' concerns that they would not be sufficiently protected in the CCAA Proceeding based on the general fairness of Canadian proceedings.  (*Id.* at 28–29.) Finally, the court disposed of the Asbestos Parties' argument that their section 524(g)-related concerns render the requested relief contrary to public policy.  In one paragraph, it analogized the lack of section 524(g) protections to the absence of a jury trial right, which this Court previously found not to meet the public policy exception.  (*Id.* at 30 (citing *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006))).

On November 12, 2025, the Asbestos Parties filed a Notice of Appeal. (Docket No. 144) (Appendix, Tab 17).  They filed an Amended Notice of Appeal the next day.  (Docket No. 145) (Appendix, Tab 18).

The Asbestos Parties also filed a Motion to Alter or Amend the Judgment, requesting that the bankruptcy court make rulings on the admissibility of certain

18

portions of deposition and hearing transcripts submitted by the Asbestos Parties. (Docket No. 146) (Appendix, Tab 19).  The bankruptcy court denied the Motion to Alter or Amend the Judgment on January 16, 2026.  (Docket No. 157) (Appendix, Tab 21).

## Summary of the Argument

The bankruptcy court committed several key errors in recognizing the CCAA Proceeding. *First*, the court erred by recognizing the CCAA Proceeding as a foreign main proceeding. ACL maintains its COMI in the United States, not Canada. ACL's primary assets—insurance policies governed by New York law that exist solely to resolve the claims of U.S. asbestos victims—are located in the U.S. Virtually all of ACL's creditors are U.S. asbestos victims, and all its material liabilities arise under U.S. state tort law. For decades, ACL's predominant business has been the defense of U.S. litigation filed by U.S. victims injured by products ACL intentionally sold into the U.S. And more than 1,500 U.S. plaintiffs have affirmatively objected to recognition of the Canadian proceeding. Contrary to the bankruptcy court's holding, their status as involuntary creditors *reinforces*, rather than negates, the importance of their interests. The bankruptcy court's invention of the voluntary vs. involuntary distinction to ignore creditors' expectations itself constitutes error.

ACL's nominal, legacy Canadian-based activities are minimal in scope and significance when compared to its U.S.-based operations. Because the company's operational reality is defined entirely by U.S.-based litigation management, and because its principal interests and real-world operations lie in the United States, ACL's COMI lies in the United States. The court erred by concluding otherwise. For the same reasons, the court erred by finding, in the alternative, that the CCAA

20

Proceeding would qualify as a foreign nonmain proceeding: ACL lacks an "establishment" in Canada because its only assets and employees are holdovers from its former asbestos-mining operations, and it does not engage in any ongoing, nontransitory economic activity in Canada.

*Second*, the court further erred by extending the automatic stay to non-debtor third parties CLMI, Resolute, and General Dynamics. That extension fails to "sufficiently protect[]" the U.S. asbestos victims' interests, as required by section 1522. *See* 11 U.S.C. § 1522. And it subjects creditors to precisely the "prejudice and inconvenience" section 1522 was designed to prevent by requiring the claimants—many of whom are seriously ill—to resolve their claims in a foreign forum. Similarly, the extended stay undermines the "just treatment" of the claimholders by insulating non-debtor third parties (particularly the insurers) from U.S. litigation, while offering no corresponding protection to claimants. The extended stay also fails to effectuate the purpose of chapter 15, as required by section 1521(a)(7). *See* 11 U.S.C. § 1521(a)(7).

*Third*, and most troubling, the relief the bankruptcy court granted was improper under section 1506 because it is manifestly contrary to U.S. public policy. *See* 11 U.S.C. § 1506. Congress determined that in the context of asbestos litigation, courts must provide certain protections to both current and future asbestos claimants, which it codified in section 524(g). For example, the Supreme Court has explained

21

that section 524(g) is the "only *one* context" in which Congress has authorized nonconsensual third-party releases against non-debtors. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 222 (2024). But instead of analyzing whether the CCAA Proceeding provides protections equivalent to those in section 524(g), the bankruptcy court granted relief that immediately displaces thousands of U.S. tort claimants from U.S. courts and freezes their actions. In doing so, the court blessed a foreign process that may extinguish U.S. causes of action without the structural protections that Congress and the Supreme Court have treated as essential limits in this area. And that result supplies a roadmap for asbestos debtors to evade the substantive limits Congress imposed on non-consensual third-party protections. If the decision below stands, debtors may restructure abroad and then invoke chapter 15 to confer de facto third-party protection without complying with asbestos-specific safeguards. This Court should not permit that result.

The Recognition Orders should be reversed.

22

## Argument

**I.    The Bankruptcy Court Erred by Recognizing the CCAA Proceeding as a Foreign Main Proceeding and by Alternatively Finding that the CCAA Proceeding Would Qualify as a Foreign Nonmain Proceeding.**

Congress enacted chapter 15 "to provide effective mechanisms for dealing with cases of cross-border insolvency." *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) (quoting 11 U.S.C. § 1501(a)). That chapter applies, for example, when a foreign court or representative seeks assistance in the United States in connection with a foreign proceeding, or when a foreign proceeding and a case under title 11 against the same debtor are pending concurrently. *See* 11 U.S.C. § 1501(b). "The first step to obtaining relief under chapter 15 . . . is receiving 'recognition' of the foreign proceeding." *SPhinX*, 351 B.R. at 115.

Chapter 15 recognition requires that a foreign proceeding be either "foreign main" or "foreign nonmain." 11 U.S.C. § 1517(b). The foreign representative bears the burden of proof. *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 196 (Bankr. S.D.N.Y. 2017). The bankruptcy court is not permitted to "rubber stamp[]" an application and "must make an independent determination" of whether the burden is met. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007) ("*Bear Stearns I*"), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ("*Bear Stearns II*").

23

Here, ACL did not meet its burden.  ACL's "center of main interests" is not in Canada, and it does not have an "establishment" in Canada within the meaning of section 1502.  The bankruptcy court therefore erred by recognizing ACL's CCAA Proceeding under chapter 15.

**A. The CCAA Proceeding is not a foreign main proceeding because ACL's COMI is not in Canada.**

A foreign main proceeding is one "pending in the country where the debtor has [its] center of [] main interests," known as its COMI.  11 U.S.C. § 1502(4).  A flexible analysis determines where a debtor's COMI lies.  *See In re Fairfield Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013).  Chapter 15 "creates a rebuttable presumption that the country where a debtor has its registered office will be its COMI."  *Id.* (citing 11 U.S.C. § 1516(c)).  But that presumption, which was "included for speed and convenience of proof where there is no serious controversy," is not a strong one—especially "in the event of a serious dispute."  *SPhinX*, 351 B.R. at 117 (quoting H.R. Rep. No. 109–31, pt. 1, 109th Cong. 1st Sess. at 112–13 (2005)).

"[F]ederal courts have focused on a variety of other factors" beyond the location of the debtor's registered office, including: (1) the location of the debtor's headquarters; (2) the location of those who actually manage the debtor; (3) the location of the debtor's primary assets; (4) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and (5) the

24

jurisdiction whose law would apply to most disputes. *Fairfield Sentry*, 714 F.3d at 137 (quoting *SPhinX*, 351 B.R. at 117).

In particular, courts consider creditors' preference and expectations. *In re Olinda Star Ltd.*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020). Although no one factor is dispositive and courts must engage in more rigorous scrutiny than just a "mechanical application" of the factors, *Fairfield Sentry*, 714 F.3d at 137, creditor support carries heavy weight: "Because their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI," *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 275 (Bankr. S.D.N.Y. 2019) (quoting *SPhinX*, 351 B.R. at 117). But if creditor acquiescence justifies deference to a debtor's proposed COMI, creditor objection must also factor into the inquiry—and here, a proper evaluation of the relevant factors shows the bankruptcy court erred by concluding that ACL's COMI is in Canada.

### i.   *ACL's primary assets are in the United States.*

The bankruptcy court failed to properly account for ACL's most valuable assets: its insurance policies. As the court found, "it cannot be disputed that the insurance policies which have already reimbursed more than USD $90 million in indemnity and defense costs are ACL's *primary assets*." (Mem. Op. at 21 (emphasis added) (Appendix, Tab 15)). In fact, the court found, ACL and CLMI were "driven" to the CCAA Proceeding because of their "fear of exhausting th[ose] insurance

assets"—highlighting the importance of the insurance policies to ACL's business decisions. *See* (*id.*).

Those insurance policies are strongly tied to the United States and not Canada. "It has long been recognized that the location of intangible assets is highly context specific," and in "the COMI context," courts should consider "pragmatic considerations affecting the Debtors' cases." *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 728 (Bankr. S.D.N.Y. 2024) (alteration omitted); *cf. In re Blixseth*, 484 B.R. 360, 367 (B.A.P. 9th Cir. 2012) (rejecting, in the context of bankruptcy venue, a rule that "intangible assets either have no location at all or are always located at the debtor's residence" in favor of an approach that "appl[ies] 'common sense' notions of justice and convenience based on the particular circumstances"). One such consideration is the country in which creditors will require judicial assistance to enforce a judgment against the assets. *Sunac*, 656 B.R. at 728. Intangible assets follow the forum where creditors must enforce their rights. *See id.* at 728–29.

Here, the insurance policies are triggered entirely by United States litigation— the natural consequence of ACL's asbestos being directed to the United States. (*See* Oct. 8 Tr. at 267:16–19 (Appendix, Tab 14A) (ACL's President agreeing that "all of ACL's active litigation is in the United States")). All asbestos liabilities in this case arise under U.S. law. All pending tort suits are in U.S. courts. (*Id.*). The CLMI policies contain service-of-suit clauses requiring underwriters to submit to the

26

jurisdiction of U.S. courts.  (Oct. 9 Tr. at 47:23–48:9 (Appendix, Tab 14B)); (APX87 at 14 (Appendix, Tab 30)).  The ISA itself confirms the point: the agreement that governs the administration of defense costs and asbestos-related judgments against ACL is expressly governed by, and to be construed under, New York law.  (CLX2 at 20 ¶ 16 (Appendix, Tab 31)). Additionally, the policies are managed from within the U.S. by Resolute, a Boston-based, Berkshire Hathaway-owned, entity.  (APX76 at 32 (Appendix, Tab 27)).

Most importantly, the policies were issued to a *U.S. company*, General Dynamics.  (Docket No. 23 at 38 (Appendix, Tab 3)).  And at least some of those policies were issued by U.S.-based carriers.  (Docket No. 23, Exhibit 34 (Appendix, Tab 3)).  ACL's insurance policies are therefore located in the United States because U.S. courts are the judicial bodies that will enforce rights against those policies.  *See Sunac*, 656 B.R. at 728–29.

The court below largely focused on Resolute's historically limited role in ACL's litigation, but Resolute itself acknowledged that after the South Carolina Receiver was appointed in 2023, it was "forced to take a greater role, including . . . hiring defense counsel for ACL" in certain cases.  (Docket No. 83 at 8 (Appendix, Tab 10)); *see In re Serviços de Petróleo Constellation S.A.*, 613 B.R. 497, 511 (Bankr. S.D.N.Y. 2020) (explaining that if an entity "exists for" a particular "task," the location from which that task is managed "should weigh more heavily" in the

COMI analysis); *In re Brit. Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) (considering the location of "day to day activity" in the COMI analysis). That more recent role is particularly important because a debtor's COMI is "determined based on its activities at or around the time the Chapter 15 petition is filed." *Fairfield Sentry*, 714 F.3d at 137.

The bankruptcy court failed to engage with the substance of the record, instead concluding that the situs of ACL's insurance policies was at best "a wash" because the Canadian proceeding was likely to administer them. (Mem. Op. at 22 (Appendix, Tab 15)). In other words, the court reasoned that because the debtor *filed* in Canada, its intangible assets will be *administered* in Canada, meaning those assets are *located* in Canada—thereby justifying recognition of the Canadian filing. But that collapses the COMI inquiry into a self-validating analysis. The recognition process is designed to ensure that debtors seek foreign protection in the proper jurisdiction, and it is not a rubber stamp that converts any chosen forum into the entity's COMI by retroactively deeming assets to be located there. *See Bear Stearns II*, 389 B.R. at 333–34 ("The objective criteria for recognition reflect the legislative decision by UNCITRAL and Congress that a foreign proceeding should not be entitled direct access to or assistance from the host country courts unless the debtor had a sufficient *pre-petition* economic presence in the country of the foreign proceeding." (emphasis added)). The mere act of filing abroad cannot relocate intangible assets to the foreign

28

jurisdiction, and the bankruptcy court's decision to short-circuit the inquiry was error.

ACL's insurance proceeds are administered in the U.S. for U.S. litigation and are intended to defend U.S. asbestos claims and compensate valid U.S. asbestos victims.  The bankruptcy court erred by not definitively determining that the policies—ACL's primary assets—are located in the United States.

### ii.    The creditors' preference and expectations weigh heavily against a Canadian COMI.

The protection of creditors' interests is a "paramount" consideration in the COMI analysis.  *In re Mod. Land (China) Co., Ltd.*, 641 B.R. 768, 788 (Bankr. S.D.N.Y. 2022).  Courts consider where creditors would reasonably expect a liquidation or restructuring to take place.  That consideration guards against a debtor or stakeholder (such as the insurer that initiated the foreign proceeding) from steering the proceeding to a jurisdiction that undermines creditor interests.  *See In re Mega Newco Ltd.*, No. 24-12031 (MEW), 2025 WL 601463, at *4 (Bankr. S.D.N.Y. Feb. 24, 2025) ("If COMI manipulation is a matter of concern because of the risk that creditors' rights and expectations might be thwarted, then one of the main factors I ought to consider, in deciding whether such a manipulation has occurred, is whether the affected creditors have asserted any objection.").

29

As the bankruptcy court acknowledged, all the litigation against ACL and all mass tort claimants (who are the overwhelming majority of ACL's creditors) are located in the United States. *See* (Mem. Op. at 23 (Appendix, Tab 15)). ACL's predominant business for decades has been the defense of U.S. litigation filed by U.S. victims grievously injured by products ACL intentionally sold into the U.S. Much of the underlying litigation has been pending for decades, with most suits filed before 2005, and some before 1997. *See* (Mem. Op. at 22 (Appendix, Tab 15)); (Oct. 8 Tr. at 28:24–29:1 (Appendix, Tab 14A)). Absent recognition of the CCAA Proceeding, those claims would be adjudicated under U.S. law in U.S. courts. A debtor's COMI should be ascertainable by third parties, and these objective, external facts would lead reasonable parties to understand that ACL's ongoing affairs were centered in the United States. *See Fairfield Sentry*, 714 F.3d at 136–37.

The record reflects the settled expectations and reliance interests of the plaintiffs in those cases: A total of 1,579 plaintiffs, represented by 12 law firms, have affirmatively objected to recognition of the Canadian proceeding. *See* (Oct. 8 Tr. at 66:8–10 (Appendix, Tab 14A)). Their preference and expectations weigh strongly against recognition.

The bankruptcy court discounted the expectations of ACL's U.S. asbestos victims based on their status as involuntary (rather than voluntary) creditors. (Mem. Op. at 23–25 (Appendix, Tab 15)). That was an error of law.

30

The court relied on *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017), and *In re OAS S.A.*, 533 B.R. 83, 102–03 (Bankr. S.D.N.Y. 2015), to determine that courts should look to public documents and filings of a debtor to see if a third party could ascertain the debtor's COMI "when contracting with the entity." (Mem. Op. at 23–24 (Appendix, Tab 15)) (emphasis omitted).  In those cases, the relationships between the debtor and creditor were contractual, so the contracts were a reasonable source of evidence to determine those creditors' expectations.  Nothing in those decisions, however, suggests that involuntary creditor expectations must be ignored—especially not in a mass tort case.  Nothing in *Fairfield Sentry* or any other caselaw suggests that creditor expectations become irrelevant because the creditors did not choose to extend credit by contract.

To the contrary, involuntary creditors have a direct and substantial interest in "regularity and ascertainability," *Fairfield Sentry*, 714 F.3d at 136, particularly where, as here, their claims arise from long-running litigation pursued openly and exclusively in U.S. courts.  Having chosen to operate in the U.S. and litigate the resulting claims here for decades, ACL cannot now invoke the involuntary nature of asbestos claims to disregard the settled, objectively reasonable expectations that its affairs would be administered in the United States.  If anything, the involuntary status of these creditors reinforces the importance of their interests: Voluntary

31

creditors at least implicitly consented to the possibility of being affected by a debtor's default, whereas involuntary creditors—tort claimants who are the innocent victims of the debtor's misconduct—had no such opportunity to consent.

Any remaining doubt is dispelled by ACL's own conduct. As noted, the ISA contains both a New York choice-of-law provision and a New York arbitration venue provision. (Docket No. 4 at 24 ¶ 45 (Appendix, Tab 2)); (Docket No. 2 at 8 ¶ 27 n.8 (Appendix, Tab 1)). By selecting New York law and a New York forum to govern its most significant and enduring source of liability, ACL itself signaled that it expected its asbestos-related affairs to be administered in the United States.

ACL's U.S. asbestos victims—living and dying with mesothelioma, asbestosis, and related diseases—have every legitimate expectation that their claims would be resolved in the courts where ACL's products caused harm and where they filed suit. And the creditors' expectations are expressly stated. (Docket No. 74, Exhibit 1 at 10 ¶¶ 26–27 (Appendix, Tab 7)); (Docket No. 76, Exhibit 7 (Appendix, Tab 9)). The location, expectations, and expressed preference of the creditors strongly militate in favor of finding that ACL's COMI is not in Canada.

### iii.    *ACL's Canadian-based activities and assets are modest in scope and significance when compared to its U.S.-based affairs.*

The remaining evidence, such as the location of the debtor's true headquarters, managers, and the majority of its creditors, demonstrates the bankruptcy court's error

32

in finding ACL's COMI is in Canada. For decades, ACL's only meaningful business activity has been the defense and management of U.S. asbestos claims. Virtually all of its creditors reside in the United States, its material liabilities arise exclusively under U.S. law, and its corporate existence is defined by its participation in the U.S. litigation system. ACL's COMI necessarily follows those liabilities and those stakeholders.

The bankruptcy court found that ACL's true headquarters is in Canada. (Mem. Op. at 19 (Appendix, Tab 15)). But an entity's headquarters is not where the entity is organized or first registered to do business; rather, it is "the place where the primary management" takes place, including "all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions." *Brit. Am. Ins. Co.*, 425 B.R. at 911. And the COMI inquiry focuses on the debtor's current activities as of the date of the chapter 15 petition, not "the debtor's entire operational history." *Fairfield Sentry*, 714 F.3d at 134.

Yet many factors the bankruptcy court relied on—such as ACL's nominal incorporation in Canada, its contaminated mines, and a small number of vestigial employees—are simply remnants of its historical asbestos-mining business. ACL itself acknowledged as much in its initial filing in the CCAA Proceeding. After describing its historical asbestos-mining business, ACL explained that "ACL's activities, *at this stage*, involve dealing with the numerous litigation claims that it is

33

facing in the United States and elsewhere as a result of ACL's former activities related to its asbestos mining." (Docket No. 2, Exhibit 1 at 11 ¶ 33 (Appendix, Tab 1) (emphasis added)).

To be sure, ACL may have had significant operations in Canada when it actively mined asbestos. But its mines closed decades ago. And its asserted future plans to monetize Canadian properties through "the sustainable development of ACL's properties" and the "innovation and implementation of new energy sources" remain purely aspirational. (*Id.* at 11 ¶ 32). ACL has identified no meaningful revenues from those initiatives, underscoring their limited relevance to the COMI analysis when compared to the insurance assets that fund its litigation exposure. *See* (*id.*); (Oct. 8 Tr. at 136:7 (Appendix, Tab 14A) (Monitor Chaaban describing ACL as a "shell")). ACL's *current activities* overwhelmingly concern the management and resolution of the U.S. litigation and the associated insurance assets. Regardless of where ACL maintains nominal corporate formalities or residual property, its principal interests and its real-world operations are in the United States.

> **iv.    The bankruptcy court wrongly excluded evidence that would have confirmed that ACL's COMI is not in Canada.**

Although the facts above are sufficient to demonstrate the bankruptcy court's error, the court wrongly excluded evidence that would have further demonstrated that ACL's COMI is not in Canada.

Ahead of the hearing, the bankruptcy court erroneously excluded the deposition testimony of André LaChance, a former ACL employee and designated corporate representative, who confirmed that ACL does not have any non-asbestos business lines or employees.  Under Federal Rule of Civil Procedure 32(a)(8), a lawfully taken deposition "filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties . . . to the same extent as if taken in the later action."  A previously taken deposition "may also be used as allowed by the Federal Rules of Evidence."  *Id.*  Under Rule 32(a)(8)'s "bifurcated analysis," "*either* a deposition receives special treatment because it was taken in a separate action with parity of subject matter and of parties, *or* the deposition is analyzed under the FRE like any other piece of evidence."  *Rao v. Rodriguez*, No. 14-CV-1936 (NGG) (ST), 2017 WL 1753489, at *2 (E.D.N.Y. May 1, 2017) (emphasis added).  The bankruptcy court misunderstood the *Rao* opinion and legally erred—thus abusing its discretion—by focusing solely on whether the cases involved the same subject matter and ignoring that the Federal Rules of Evidence provide an independent basis for the admissibility of the previous deposition testimony.  *See* (Docket No. 127 at 4 (Appendix, Tab 13) (holding court would "not admit the testimony under Rule 32(a)(8), regardless of whether it would otherwise be admissible under the Federal Rules of Evidence")); *Bernard L. Madoff*

35

*Inv. Sec.*, 605 B.R. at 582 ("[A] bankruptcy court abuses its discretion if it rests its conclusion on . . . an incorrect legal standard." (quoting *Avaya*, 602 B.R. at 453)).

After incorrectly concluding a deposition could be used only if the two cases involved the same subject matter, the bankruptcy court further abused its discretion by holding LaChance's testimony was not admissible under Federal Rule of Evidence 801. *See* (Docket No. 127 at 4–5 (Appendix, Tab 13)). Under Rule 801, an opposing party's statement is not hearsay when it is offered against that party. Fed. R. Evid. 801(d)(2). "[T]he deposition of a party's designee would ordinarily be admissible non-hearsay as the statement of a party opponent's agent." *Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, No. 5:20-CV-02274 (JMG), 2022 WL 2188146, at *5 (E.D. Pa. Mar. 7, 2022).

ACL had designated LaChance as its Rule 30(b)(6) corporate representative in a Washington state case, *Kotzerke v. 3M Co.*,[8] less than a year before this chapter 15 petition was filed. (APX3 (Appendix, Tab 23)). LaChance testified on matters directly concerning ACL's present business operations. Specifically, he testified that ACL had no employees and sells nothing:

---

[8] Case No. 23-2-05287-6.

BY MR. BRANHAM:

Q.    Sure.  Let me try it this way:  How many people work for Asbestos Corporation Limited today, if you know?

MR. TUVIM:  Form.

THE WITNESS:  For Asbestos Corporation?

BY MR. BRANHAM:

Q.    Yes.

A.    None.

BY MR. BRANHAM:

Q.    And does Asbestos Corporation today still sell asbestos?

A.    No.

Q.    Does it sell anything?

A.    No.

(APX3 at 25:8–17; 24:17–22 (Appendix, Tab 23)).  That testimony is admissible as an opposing party's statement under Rule 801(d)(2).

Like its federal counterpart, Washington State Superior Court Civil Rule 30(b)(6) requires that a corporation's designated witness "testify as to the matters known or reasonably available to the organization."  Wash. Super. Ct. Civ. R. 30(b)(6).  *See also* Fed. R. Civ. P. 30(b)(6).  Parties must be permitted to ask foundational questions necessary to test whether the corporation has identified the right witness, how that witness obtained information, and whether the organization actually has the capacity to know the information sought.  This is especially true in *Kotzerke* because ACL had repeatedly asserted there was no ACL "former or

37

*current*" employee who could testify as to the plaintiffs' designated topics before ultimately designating LaChance.  (Docket No. 98, Exhibit 4 at 8 (Appendix, Tab 11) (emphasis added)).  LaChance's testimony that ACL had no employees and did not sell anything was relevant to how ACL's corporate knowledge was (or was not) maintained, who (if anyone) held that knowledge, and whether ACL had any present institutional structure capable of preserving the records and information needed to address ACL's historical records and sales.  The bankruptcy court thus erred by holding that questions about ACL's current operations were outside the scope of the Rule 30(b)(6) notice and nonbinding on ACL.  LaChance's testimony is admissible as an opposing party's statement under Federal Rule of Evidence 801(d)(2), so it is admissible under Federal Rule of Civil Procedure 32(a)(8).

The bankruptcy court also excluded relevant evidence at the hearing itself. Without any justification, the court excluded two exhibits that ACL did not object to in the Joint Pretrial Order, even though ACL had agreed to waive any objections not raised at that time.  *See* (Docket No. 111 at 8 (Appendix, Tab 12)); (*id.*, Exhibit 2 at 8, 10); (Oct. 8 Tr. at 142:6–10; 148:4–13 (Appendix, Tab 14A)).  In those exhibits, Richard Dufour—counsel to ACL, who spoke on behalf of the company as recently as October 2024—declared that ACL "has only seven employees at this time," who "all are involved in clerical and administrative activities generally involved with asbestos lawsuits."  (APX65 at 2 ¶ 4 (Appendix, Tab 26)); *see* (APX44 (Appendix,

38

Tab 25)).  That evidence would have shown that any remaining business at ACL revolves around asbestos litigation in the United States.  Yet despite the "low threshold" of Rule 401's relevancy test, which is typically "easily satisfied," the bankruptcy court wrongly excluded those exhibits on relevance grounds.  *United States v. Garnes*, 102 F.4th 628, 638 (2d Cir. 2024).

When properly considered, ACL's own prior corporate testimony directly undermines the Foreign Representative's assertions regarding ACL's alleged business activities in Canada and further tips the scales in favor of finding that ACL's COMI is not in Canada.

### B. The CCAA Proceeding is not a foreign nonmain proceeding.

The bankruptcy court likewise erred by finding, in the alternative, that the CCAA Proceeding would be recognized as a foreign nonmain proceeding.  A foreign nonmain proceeding is "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." 11 U.S.C. § 1502(5). An "establishment" is "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502(2).  "The existence of an 'establishment' is essentially a factual question, with no presumption in its favor." *Bear Stearns II*, 389 B.R. at 338.

The "mere presence of assets in a given location does not, by itself, constitute an establishment." *Lavie v. Ran*, 406 B.R. 277, 284 (S.D. Tex. 2009), *aff'd sub. nom.*

39

*In re Ran*, 607 F.3d 1017 (5th Cir. 2010). Rather, the debtor must "conduct business" in that country, *Brit. Am. Ins. Co.*, 425 B.R. at 915, which requires a "showing of a local effect on the marketplace." *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016). To make this showing, the Foreign Representative must demonstrate "more than mere incorporation and record-keeping and more than just the maintenance of property." *Id.*

For substantially the same reasons that undermine the court's COMI determination, ACL lacks an "establishment" in Canada. Guy Bérard, ACL's president, testified only about property maintenance, leasing, and early-stage investigatory efforts. The bankruptcy court's exclusion of the LaChance deposition and the Dufour statements undermined its finding that ACL had an establishment in Canada. Regardless, the record shows ACL's remaining assets and employees are holdovers from its former asbestos-mining operations and that ACL does not presently engage in ongoing, nontransitory economic activity in Canada. Although ACL claims to be exploring new avenues of business, it has not shown any concrete operations, ongoing commercial activity, or revenues reflecting any "local effect on the marketplace." *Id.* And courts have squarely rejected the notion that activities such as the "retention of counsel and accountants, investigation of assets and liabilities, and reporting to" a court "constitute business activities" for purposes of

40

foreign nonmain recognition. *Id.* at 521 (quoting *Brit. Am. Ins. Co.*, 425 B.R. at 915).

Accordingly, the evidence showed nothing beyond property maintenance, administrative functions, and early-stage, pre-commercial experimentation that does not rise to the level of nontransitory economic activity. The bankruptcy court therefore erred by finding that the CCAA Proceeding would qualify as a foreign nonmain proceeding.

## II. Even if Recognition of the CCAA Proceeding Were Proper, the Bankruptcy Court Erred by Extending the Automatic Stay to Non-Debtor Third Parties.

The bankruptcy court erred in extending the automatic stay to non-debtor third parties CLMI, Resolute, and General Dynamics (collectively, the "Stay Parties"). Thus, even if this Court affirms recognition, it should reverse the bankruptcy court's extension of the stay.

A foreign representative seeking additional relief beyond the automatic effects of section 1520 must satisfy the requirements of all relevant sections of the Bankruptcy Code. *See* 11 U.S.C. §§ 1521, 1522. Section 1521(a)(7) allows a court that has recognized a foreign proceeding to "grant[] any additional relief" necessary to effectuate the purpose of chapter 15 and "to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a)(7); *see also* § 1522(a) (permitting relief under section 1521 "only if the interests of the creditors . . . are sufficiently

41

protected"). Here, the bankruptcy court's extension of the stay to third-party non-debtors does not sufficiently protect the creditors' interests, and it undermines the purpose of chapter 15. The extension of the stay to the third-party non-debtors should be vacated.

### A. Extending the stay fails to "sufficiently protect" the creditors' interests, as required by section 1522.

Under section 1522(a), a court may grant discretionary relief under section 1521 "only if the interests of creditors . . . are sufficiently protected." 11 U.S.C. § 1522(a); *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009). "Sufficient protection" entails three principles: (1) "the just treatment of all holders of claims against the bankruptcy estate," (2) "the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the foreign proceeding," and (3) "the distribution of proceeds of the foreign estate substantially in accordance with the order prescribed by U.S. law." *Atlas Shipping*, 404 B.R. at 740 (alterations and citations omitted). These principles favor the Asbestos Parties, and the bankruptcy court's extension of the stay to non-debtor third parties runs afoul of section 1522.

First, extending the stay subjects the U.S. asbestos claimants to precisely the "prejudice and inconvenience" section 1522 was designed to prevent. *All* pending asbestos litigation against ACL and the non-debtor third parties is located in the U.S.

42

(Oct. 8 Tr. at 267:16–19 (Appendix, Tab 14A)); *see* (Docket No. 4 at 37 ¶ 69 (Appendix, Tab 2)).    The asbestos claimants here are involuntary creditors— ordinary individuals who never elected to deal with ACL, never assumed the risks of cross-border litigation, and likely lack the resources to pursue their claims thousands of miles from where they live and where they were injured.  They bear no resemblance to the "sophisticated part[ies] that initiated contact with the foreign company, decided to invest in a foreign company, and chose in the first instance to litigate [their] claims in that company's home jurisdiction." *Kingstown Cap. Mgmt., L.P. v. Vitek*, 2020 WL 5350492, at *7 (S.D.N.Y. Sept. 4, 2020), *aff'd*, 2022 WL 3970920 (2d Cir. Sept. 1, 2022).  Nor are they "substantial business entities" that "sought business or made investments abroad" and are "easily capable of litigating the disputes that arose out of those ventures in the country where they occurred." *Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 238 (2d Cir. 2004). Recognition of the CCAA Proceeding, coupled with an expanded stay, effectively requires these claimants—many of whom are seriously ill—to resolve their claims in a foreign forum.

ACL placed asbestos-contaminated products into the U.S. stream of commerce for decades, and the U.S. is where those products caused injury to the asbestos claimants, where every asbestos claimant resides, and where every lawsuit was filed.  ACL's victims should not be compelled to abandon the courts of the

jurisdictions whose laws govern their injuries and to which ACL purposefully directed its products. Their claims should be adjudicated and liquidated in the U.S., where the harm occurred and where they can meaningfully access justice. Forcing thousands of sick claimants into a foreign court to litigate their disputes is highly prejudicial and fails to protect U.S. claimants "against prejudice and inconvenience in the processing of claims in the foreign proceeding." *See Atlas Shipping*, 404 B.R. at 740 (alteration omitted).

Rather than grapple with the prejudice to the asbestos plaintiffs, the bankruptcy court focused on the asserted harms to *ACL* and its insurers if a stay were not extended. (Mem. Op. at 26–27 (Appendix, Tab 15)). Section 1522(a), however, does not permit a one-sided inquiry. Instead, it "requires the bankruptcy court to ensure the protection of *both* the creditors and the debtor." *Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 27 (4th Cir. 2013); *see id.* at 32 ("[Section] 1522(a) *requires* that a bankruptcy court, when granting the discretionary relief authorized by § 1521, *ensure sufficient protection of creditors*, as well as the debtor."). The bankruptcy court erred by failing to "adequately balance[] the parties' interests, as required by § 1522." *In re Qimonda AG Bankr. Lit.*, 433 B.R. 547, 558 (E.D. Va. 2010).

Similarly, extending the stay undermines the "just treatment" of claimholders. The only creditors meaningfully affected by this case are the U.S. asbestos victims. Yet the relief granted will disproportionately benefit non-debtor third parties

44

(particularly the insurers) by insulating them from the U.S. litigation, while offering no corresponding protection to claimants. This asymmetry is incompatible with section 1522.

The bankruptcy court wrongly dismissed concerns about prejudice to the U.S. claimants on the theory that these issues could be addressed later, within the Canadian process. *See* (Mem. Op. at 28–29 (Appendix, Tab 15)). The statute requires that creditor interests be sufficiently protected *before* granting relief under section 1521. 11 U.S.C. § 1522(a) (authorizing a court to grant relief under section 1521 "*only if* the interests of creditors . . . are sufficiently protected" (emphasis added)). Tellingly, section 1522(b) also grants courts the ability to prophylactically "subject relief granted" under section 1521 "to conditions it considers appropriate, including the giving of security or the filing of a bond"—a provision that would be unnecessary if courts could ignore future risks when granting relief under section 1521. *See Jaffe*, 737 F.3d at 30 (affirming bankruptcy court's analysis under section 1522, which accounted for the "substantial *risk* of harm" and the harm that could result from the "*threat* of infringement litigation").

Extending the stay to non-debtor third parties will force sick individuals into a foreign court, leading to unjust treatment of claimholders and substantial prejudice and inconvenience in processing their claims abroad. It does not "sufficiently

45

protect[]" the creditors' interests as required by section 1522. The extension was therefore improper.

## B. Extending the stay fails to effectuate the purpose of chapter 15.

Extending the stay was also erroneous because it fails to effectuate the purpose of chapter 15, as required by section 1521(a)(7). In fact, it undermines the purpose of chapter 15 by shielding non-debtors from domestic tort accountability.

"Bankruptcy and the automatic stay generally are not designed to protect a debtor's insurance carrier (or any other non-debtors) from the claims of creditors unless specifically provided under the Bankruptcy Code." *In re Maschinenbau*, 664 B.R. 863, 875 (Bankr. N.D. Ga. 2024). In *Maschinenbau*, the court considered several critical facts: The claimant's injury was in the United States, the debtors had litigated the U.S. case for years, the insurance carrier—not the debtors—was paying all litigation costs, and the United States had a strong interest in being the forum to liquidate the claim. *Id.* at 875–76. Because the debtors were "not shouldering any costs of litigating" the claim and the debtors "offered no evidence that the policy limits are in danger of drying up anytime soon," the court "easily conclude[d] that relief from the automatic stay" was appropriate to allow the claimant to liquidate her claims in the United States and seek collection of any judgment against the insurer. *Id.* at 876, 879.

46

Just as in *Maschinenbau*, ACL's U.S.-based asbestos victims filed suit in the only forum connected to their injuries, the witnesses, and the governing law. And just as in *Maschinenbau*, the primary—and indeed overwhelming—beneficiary of an extended stay here would not be the foreign debtor's estate, but its insurers, who were the driving force in filing the initial application in the CCAA Proceeding. *See* (APX76 (Appendix, Tab 27)) (initial application filed by CLMI in CCAA Proceeding). And like in *Maschinenbau*, an extended stay would cause claimants to lose hard-won progress in their cases—many of which have been pending in U.S. courts for decades. *See* (Mem. Op. at 22 (Appendix, Tab 15)); (Oct. 8 Tr. at 28:24–29:1 (Appendix, Tab 14A)).

The bankruptcy court's attempt to distinguish *Maschinenbau* on the grounds that denying a stay there posed little risk to the debtor misunderstands the relief granted. In *Maschinenbau*, the court expressly preserved the automatic stay for the debtors themselves and lifted it only as to the non-debtor insurer because any potential "risk of prejudice to the Debtors through erosion of the policy limits" could be fully addressed by maintaining stay protection for the debtors while allowing the claimant to proceed against the insurer. 664 B.R. at 879. The same is true here. ACL would remain fully protected by the automatic stay if this Court affirms recognition; no party has argued for stay relief against the debtor.

47

The bankruptcy court suggested that ACL could face exposure through the insurance stack if third parties are sued. *See* (Mem. Op. at 26–27 (Appendix, Tab 15)). But that attenuated, contingent connection is not the kind of direct threat to the debtor's reorganization that justifies extending the automatic stay to non-debtor third parties. *Maschinenbau*'s holding is directed at whether the stay extension is necessary to protect the debtor's estate—not whether some indirect, layered insurance relationship theoretically links the debtor to third-party litigation.

The non-debtor third parties should not receive extraordinary stay protection that the Code does not authorize. Chapter 15 is not a tool for shielding non-debtors from domestic tort accountability. *Maschinenbau*, 664 B.R. at 875; *see also id.* ("Congress clearly excepts liquidation of personal injury tort and wrongful death claimants from the otherwise strong policy favoring resolution of creditor claims in a single insolvency forum . . . ."); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). Allowing the non-debtors to use the CCAA Proceeding and chapter 15 as a shield does not effectuate the purpose of chapter 15; it undermines it.

III. **The Bankruptcy Court Erred by Ordering Relief that is Manifestly Contrary to U.S. Public Policy, and its Decision Gives Future Debtors a Roadmap to Avoid the Strictures of U.S. Bankruptcy Law.**

A. **Recognition of the CCAA Proceeding and extension of the automatic stay are manifestly contrary to U.S. public policy.**

Even if the bankruptcy court did not err by finding that the CCAA Proceeding was a foreign main or nonmain proceeding, or by determining that the debtor would be injured without a stay extension, it erred because the relief it granted is manifestly contrary to public policy. Any grant of relief under chapter 15 "is subject to the caveat in § 1506," which authorizes courts to "deny the relief requested where such relief would be 'manifestly contrary to the public policy of the United States.'" *In re Toft*, 453 B.R. 186, 191 (Bankr. S.D.N.Y. 2011) (quoting 11 U.S.C. § 1506). As explained in the Guide to Enactment promulgated by the United Nations Commission on International Trade Law, the public policy exception enables states to refuse the application of foreign law when such recognition would contravene fundamental principles of the recognizing state's laws. United Nations Commission on International Trade Law, UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation, ¶ 102 (2014). Section 1506 thus prohibits relief when the foreign proceeding is procedurally unfair or when recognition would "severely impinge the value and import of a U.S. statutory or constitutional right." *Jaffe*, 737 F.3d at 21. Here, the relief the bankruptcy court ordered is manifestly contrary to public policy.

Congress has already made clear, particularly in the mass tort asbestos setting, that extraordinary relief affecting present and unknown future claimants requires structural protections and careful line-drawing to safeguard due process interests

49

implicated by the long latency of disease. *See In re Quigley Co., Inc.*, 676 F.3d 45, 58 (2d Cir. 2012). Congress codified that policy judgment by enacting section 524(g), which creates an asbestos-specific framework that permits channeling and certain third-party protections only within carefully circumscribed bounds. Notably, that provision departs from the rest of the Bankruptcy Code by authorizing courts to enjoin claims against third parties—but in doing so, it also requires that third parties help fund the trust in exchange for that benefit, that the process be subject to oversight by a "representative" to protect the rights of future claimants, and that any plan earn at least 75% approval of current claimants. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V), (g)(2)(B)(ii)(IV)(bb), (g)(4)(A)(ii), (g)(4)(B)(i). Section 524(g) reflects a broader point that the bankruptcy court ignored: U.S. law does not permit courts to impose sweeping restraints on claims of asbestos victims, and future claimants in particular, without meaningful, structurally protective safeguards.

The relief ordered by the bankruptcy court is contrary to public policy because it overrides the core policy commitments reflected in section 524(g). In particular, it is inconceivable that Congress enacted a detailed asbestos-specific framework in chapter 11 permitting relief in only certain circumstances, only to silently permit debtors to end-run those protections by turning to chapter 15. *See Toft*, 453 B.R. at 196 (finding section 1506's exception met for foreign procedures that "exceed traditional limits on the powers of a trustee in bankruptcy under U.S. law and

50

constitute relief that is banned by statute in this country"). This concern is heightened by the minimal threshold for chapter 15 eligibility, which requires only an "establishment" to be a nonmain proceeding—making it all too easy for entities with a superficial foreign presence to evade the limits Congress imposed on asbestos restructurings under U.S. law. While chapter 15 comity may tolerate differences in commercial restructurings with a defined creditor body, that tolerance cannot extend to proceedings that involve latent mass tort liabilities with unknown future claimants. *See In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) ("[C]ourts *must* deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States."). In the asbestos context, Congress extended certain protections precisely because future claimants' interests are insufficiently protected in ordinary creditor processes. Under section 1506, that congressional line-drawing is the relevant "public policy of the United States."

To resist this conclusion, the bankruptcy court analogized the lack of section 524(g)'s protections to the denial of the right to a jury trial, which this Court previously found not to be contrary to U.S. public policy. *See Ephedra Prods*, 349 B.R. 333 . But the jury right at issue in *Ephedra* is different from the fundamental protections found in section 524(g).

51

In *Ephedra*, this Court explained that courts routinely enforce judgments from foreign jurisdictions that do not recognize the right to a jury trial. *Id.* at 337. Even here in the United States, the right to a jury trial is not absolute, and matters are often adjudicated in bench trials. Still, this Court acknowledged that apart from trial by jury, certain procedural protections would in fact be required to deem a foreign proceeding fair. For example, it approved of the foreign procedure "only as a result" of changes to certain provisions that "could have been read as permitting the Claims Officer to refuse to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard." *Id.* at 335. In doing so, *Ephedra* recognized that the absence of certain procedural protections runs a material risk of affecting a party's substantive rights.

Here, the ability of Canadian courts to impose nonconsensual third-party releases would pose a similar risk of "liquidat[ing] claims without granting interested parties an opportunity to be heard." *Id*. At issue is not whether Canadian practice differs with respect to a single adjudicatory feature (like juries), but whether it exposes plaintiffs to a process that materially forecloses claims without structural safeguards that Congress designed for this very situation. Section 524(g)'s reticulated scheme of protections—both substantive and procedural—is critical to protecting claimants' rights. The provision conditions third-party releases on the creation of a trust that "will value, and be in a financial position to pay, present

52

claims and future demands," § 524(g)(2)(B)(ii)(V), ensuring that a pool of money will be available for claims. It limits the scope of such releases to claims that arise "by reason of" certain situations that require a relationship between the third party and a debtor—preventing overly broad releases that cover unrelated rights. § 524(g)(4)(A)(ii). It requires the appointment of a "legal representative for the purpose of protecting the rights of persons that might subsequently assert demands," § 524(g)(4)(B)(i), ensuring that future unknown claimants can have their claims preserved. And it requires 75% of known claimants to approve the plan as opposed to the 50% threshold for CCAA Proceedings, (Oct. 8 Tr. at 115:1–15 (Appendix, Tab 14A)), further guarding against unfair outcomes.

The bankruptcy court erroneously dismissed the plaintiffs' section 524(g)-related concerns as "premature," reasoning "there is nothing in the record to suggest that the exact same protections, or even *better* protections, will not be put in place in a plan confirmed by the Canadian Court." (Mem. Op. at 28 (Appendix, Tab 15)). But although no plan has been proposed in the CCAA Proceeding yet, the bankruptcy court's recognition and extension of the stay have immediate effects. As explained earlier, those steps substantively affect claimants' rights by immediately displacing all U.S. claimants from U.S. courts and freezing litigation against the debtor and non-debtor third parties.

53

ACL sought out a Canadian forum precisely because that forum does not require ACL to provide the protections in section 524(g), making it preferable to a U.S. forum.  In speculating that a Canadian court might come up with "even *better* protections" than section 524(g), the bankruptcy court failed to note that Canadian courts have never even handled an asbestos bankruptcy before.  *See* (Mem. Op. at 28 (Appendix, Tab 15)); (Oct. 8 Tr. at 278:6–9 (Appendix, Tab 14A)).  In contrast, the carefully crafted protections in section 524(g) were the product of U.S. bankruptcy courts' years of experience with multiple asbestos cases, and they were further developed and codified by Congress.  *See* (Mem. Op. at 28 n.10 (Appendix, Tab 15)).  Section 1506 does not permit extraordinary relief that materially burdens U.S. tort claimants based on speculation that a foreign court might replicate the protections Congress already enacted.[9]  The bankruptcy court therefore erred by ordering relief that contravenes Congress's explicit policy choices and places U.S.

---

[9] Moreover, since the entry of the Recognition Order, the fairness concerns the plaintiffs raised have already begun to materialize.  On January 6, 2026, the Canadian court entered a Claims Bar Date Order over the Asbestos Parties' objections, despite the absence of any discovery or meaningful access to ACL's records needed to identify potential claims. (Docket No. 155, Exhibit 3).  The order imposes a six-month cutoff that is incompatible with the nature of asbestos-related diseases and, coupled with an onerous 24-page proof of claim form, threatens to exclude large categories of valid claims before a protective framework comparable to section 524(g) even exists.  (*Id.*).

54

asbestos victims in a process that offers none of the protections that U.S. public policy provides.[10]

**B. If allowed to stand, the bankruptcy court's decision gives future debtors a roadmap to avoid the strictures of U.S. bankruptcy law and make an end run around the Supreme Court's decision in *Purdue*.**

By dismissing the victims' concerns, the bankruptcy court demonstrated how debtors can use chapter 15 to first obtain relief abroad that U.S. bankruptcy law carefully circumscribes and then turn around and enforce that relief here. In *Purdue Pharma*, the Supreme Court held that the Bankruptcy Code does not authorize a release that discharges claims against a non-debtor without the consent of the affected claimants. 603 U.S. at 226–27. In reaching that conclusion, the Court explained that section 524(g) is a "notable exception to the code's general rules," and is the "only *one* context" in which Congress has authorized such nonconsensual

---

[10] The bankruptcy court's statement that "a lack of section 524(g) guarantees in the ultimate plan will still not doom a plan under section 1506," (Mem. Op. at 30 (Appendix, Tab 15)), was unnecessary to its ruling and is not an issue before this Court on appeal. Whether any eventual foreign plan satisfies section 1506 is a distinct, future inquiry triggered only if recognition of a foreign plan is later sought. *See* 11 U.S.C. § 1521; *In re CGG S.A.*, 579 B.R. 716, 719–20 (Bankr. S.D.N.Y. 2017). But to the extent the bankruptcy court implied that relief inconsistent with section 524(g)'s fundamental protections would be compatible with U.S. public policy, that conclusion is wrong for the same reasons discussed herein: Congress has codified asbestos-specific procedural safeguards for protecting U.S. claimants, and section 1506 does not permit courts to disregard those safeguards based on speculation about what a foreign plan may or may not eventually provide.

third-party releases. *Id.* at 222. Under the bankruptcy court's reasoning, however, nonconsensual third-party releases can readily be obtained in foreign proceedings and then enforced through a chapter 15 proceeding. While *Purdue* involved an issue of statutory interpretation, the underlying concern—the nonconsensual extinguishment of a victim's cause of action, which is a "species of property," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)—implicates a victim's due process rights.

Two post-*Purdue* cases already illustrate the use of chapter 15's recognition process to obtain precisely the kinds of releases that *Purdue* forbids. In *In re Crédito Real S.A.B. DE C.V. SOFOM, E.N.R.*, a district court considered an appeal of a bankruptcy court order enforcing a Mexican plan for a financial lending institution that contained nonconsensual third-party releases. 2026 WL 881444, at *1 (D. Del. Mar. 31, 2026. It ultimately affirmed the bankruptcy court's holding that chapter 15 permits the enforcement of such an order, even if such third-party releases are typically unavailable under chapter 11. *See id.* at *5–6, *8–9. A bankruptcy court in this district reached the same conclusion in the context of a Brazilian restructuring of a construction and infrastructure business. *See In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 472 (Bankr. S.D.N.Y. 2025) ("Assuming *arguendo* that . . . the Order does create nonconsensual third-party

56

releases, the Court finds that it has the power to issue such an order in a chapter 15 case . . . .").

This Court should draw the line and hold that chapter 15 does not allow asbestos debtors to pursue restructuring abroad and thereby escape asbestos-specific safeguards that Congress deliberately imposed. Those safeguards reflect a legislative judgment about how far U.S. courts may go in binding present and future asbestos claimants and in extending protection to third-party non-debtors. *Crédito Real* and *Odebrecht* involved sophisticated financial actors in the commercial restructuring context. Because neither case arose in the context of latent mass tort liabilities, they did not implicate a foreign procedure that directly contradicts Congress's already-expressed intent. Accordingly, those cases are distinguishable, and they do not support the idea that nonconsensual third-party releases are always permissible in the chapter 15 context.

The need to clarify the reach of chapter 15 is particularly urgent now, as recent commentary highlights the possibility of using that process to obtain nonconsensual third-party releases, even after *Purdue*. For example, commentators have pointed out that companies might "consider strategic filings of non-U.S. insolvency proceedings," then "followed by a Chapter 15 filing," to "enforce nonconsensual third-party releases that would not otherwise be available under a Chapter 11 plan." J. Mazza et al., Nonconsensual Third-Party Releases Are Alive and Well in Chapter

15 Despite *Purdue*, Skadden, Arps, Slate, Meagher & Flom LLP at 7 (July 9, 2025), https://perma.cc/773P-NMLV.  That observation is not an isolated one.  *See* D. M. Primoff et al., Psst, Need a Non-Consensual Third Party Release After the Supreme Court's Purdue Decision?: Consider a Non-U.S. Proceeding Plus Chapter 15 Recognition (July 2, 2024), https://perma.cc/D62P-FSDN (explaining that post-*Purdue*, "the door [is] wide open for multinational companies (or even U.S. companies) to pursue their restructuring under a non-U.S. regime that permits non-consensual third party releases," such as a "Canadian CCAA," and "then obtain recognition of their restructuring (including the releases) in the U.S. under Chapter 15"); Kovsky-Apap, 3 Notable Developments in Ch. 15 Bankruptcy This Year, Troutman Pepper Locke  (Dec. 15, 2025), https://perma.cc/2BAU-ML36 (describing the "blueprint" that *Crédito Real* and *Odebrecht* provide multinational debtors "to achieve nonconsensual releases for their directors, officers, insiders and lenders that would not be available to them in a Chapter 11 case"); *see also* D. Spelfogel et al., Third-Party Releases Alive and Well in Chapter 15—Creative Maneuver or Comity?, 41 Rev. Banking & Fin. Servs. 81, 84 (July 2025), https://perma.cc/HK7W-Q4WE (suggesting that "foreign entities should remain strategic in their choice of venue when initiating insolvency proceedings" in light of "[r]ecent bankruptcy decisions [that] reflect a general willingness to recognize foreign proceedings, even when

58

doing so contravenes U.S. bankruptcy principles"). This Court should reverse this trend and avoid rendering section 1506 a dead letter.

## Conclusion

The bankruptcy court erred by (1) recognizing the CCAA Proceeding as a foreign main proceeding and alternatively finding that the CCAA Proceeding would qualify as a foreign nonmain proceeding, (2) extending the stay to CLMI, Resolute, and General Dynamics, and (3) ordering relief that is manifestly contrary to U.S. public policy. The bankruptcy court's Recognition Orders should be reversed.

**<u>Federal Rule of Bankruptcy Procedure 8015(h) Certificate of Compliance</u>**

This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i) because it contains fewer than 13,000 words.

April 10, 2026                          Respectfully Submitted,


                                        */s/ Cullen D. Speckhart*
                                        Cullen D. Speckhart
                                        Michael Klein
                                        Jeremiah P. Ledwidge
                                        **COOLEY LLP**
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Tel: (212) 479-6000
                                        Email: cspeckhart@cooley.com
                                               mklein@cooley.com
                                               jledwidge@cooley.com


                                        -and-

                                        Matthew T. Richardson
                                        (admitted *pro hac vice*)
                                        Kathleen M. Stoughton
                                        (admitted *pro hac vice*)
                                        **WYCHE, P.A.**
                                        807 Gervais Street, Suite 301
                                        Columbia, South Carolina 29201
                                        Tel: (803) 254-6542
                                        Email: mrichardson@wyche.com
                                               kstoughton@wyche.com

                                        -and-

                                        Charles W. Branham, III

60

(admitted *pro hac vice*)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
1801 N. Lamar Street, Suite 300
Dallas, Texas 75201
Tel: (214) 722-5990
Email: branham@dobslegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of April, 2026, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the Southern District of New York by using the CM/ECF system.

I further certify that parties of record to this appeal who either are registered CM/ECF users, or who have registered for electronic notice, or who have consented in writing to electronic service, will be served through the CM/ECF system.

I further certify that I have sent the foregoing document by email to the following parties:

**Daniel Adam Rubens**
Orrick, Herrington & Sutcliffe LLP (NYC)
51 West 52nd Street
New York, NY 10019
(212)-506-5000
Fax: (212)-506-5151
Email: drubens@orrick.com

**David Litterine-Kaufman**
Orrick, Herrington & Sutcliffe LLP (NYC)
51 West 52nd Street
New York, NY 10019
(212) 506-3528
Fax: (212) 506-5151
Email: dlitterinekaufman@orrick.com

**Evan Craig Hollander**
Orrick, Herrington & Sutcliffe LLP (NYC)
51 West 52nd Street
New York, NY 10019
212-506-3528
Fax: 212-506-5151
Email: echollander@orrick.com

**Jenna MacDonald Busche**
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
212-775-8863
Email: jmacdonaldbusche@orrick.com

**Michael Trentin**
51 West 52nd Street
New York, NY 10019
212-506-5393
Email: mtrentin@orrick.com

**Alan Craig Turner**
Simpson Thacher & Bartlett LLP (NY)
425 Lexington Avenue
New York, NY 10017
(212)455-2000 x2472
Fax: (212)255-2502
Email: aturner@stblaw.com

**Joshua Coleman Polster**
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212)-455-2266
Fax: (212)-455-2502
joshua.polster@stblaw.com

April 10, 2026                          Respectfully Submitted,

                                        /s/ Cullen D. Speckhart
                                        Cullen D. Speckhart
                                        Michael Klein
                                        Jeremiah P. Ledwidge
                                        **COOLEY LLP**
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Tel: (212) 479-6000
                                        Email: cspeckhart@cooley.com
                                                mklein@cooley.com
                                                jledwidge@cooley.com

                                        -and-

2

Matthew T. Richardson
(admitted *pro hac vice*)
Kathleen M. Stoughton
(admitted *pro hac vice*)
**WYCHE, P.A.**
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Tel: (803) 254-6542
Email: mrichardson@wyche.com
         kstoughton@wyche.com

-and-

Charles W. Branham, III
(admitted *pro hac vice*)
**DEAN OMAR BRANHAM SHIRLEY, LLP**
1801 N. Lamar Street, Suite 300
Dallas, Texas 75201
Tel: (214) 722-5990
Email: branham@dobslegal.com

3